IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

UNITED STATES OF AMERICA     *
    *
       v.     *        CR 118-008
    *
DETRA WILEY PATE     *

_____

**O R D E R**

_____

Before the Court are two post-trial motions by Defendant Detra Wiley Pate. First, Defendant moves for a judgment of acquittal under Federal Rule of Criminal Procedure 29. (Doc. 108.) Second, Defendant moves for a new trial pursuant to Federal Rule of Criminal Procedure 33. (Doc. 109.) For the reasons set forth in detail below, Defendant's motions are **DENIED**.

**I. BACKGROUND**

On December 11, 2018, after a four-day trial, the jury returned a verdict against Defendant Detra Wiley Pate finding her guilty of one count of conspiracy to commit health care fraud, twenty-four counts of health care fraud, and eight counts of aggravated identity theft. (Jury Verdict, Doc. 102.) The jury found Defendant not guilty on three counts of health care fraud. (Id.)

## A. Overview of the Scheme

Defendant owned and operated Southern Respiratory, LLC, a company that supplied durable medical equipment ("DME") in Thomson, Georgia. In 2011, Southern Respiratory became a registered Medicare provider and eventually began providing wheelchairs and similar DME to Medicare beneficiaries. The indictment[1] alleges, and Defendant was later found guilty of, engaging in a scheme to defraud Medicare by billing for wheelchairs, wheelchair accessories, and CPAP supplies that were either not prescribed or not delivered to patients. (Indictment, ¶¶ 17-28.) Defendant also engaged in a conspiracy to commit the fraud and identity theft to cover up evidence of the scheme. (Id. ¶¶ 1-16, 29-30.) Broadly speaking, the scheme involved billing Medicare for DME that was not ordered by a physician, not medically necessary, or not delivered to the patient. (Id. ¶¶ 19, 22, 25, 28.) Specifically, Defendant used Southern Respiratory's billing software, Brightree, to bill Medicare for extra heavy duty wheelchairs ("K7 Wheelchairs") and sometimes multiple accessories, even though Southern Respiratory patient files, including prescriptions and delivery tickets, showed delivery of less expensive high strength lightweight wheelchairs ("K4 Wheelchairs")

---

[1] The Court will refer to the Renumbered Trial Indictment in this Order. (See Doc. 67-1.) The Court granted the Government's motion to proceed with the renumbered indictment without objection from Defendant. (Order of Dec. 6, 2018, Doc. 86.)

and no accessories. In three instances, Defendant billed Medicare for CPAP machines and accessories that were prescribed to patients but never delivered.

**B. Evidence Introduced at Trial**

At trial, Special Agent David Graupner of the Department of Health and Human Services testified extensively for the Government regarding the investigation into Southern Respiratory and the business records obtained that illustrated the fraudulent scheme. The jury also heard from four former Southern Respiratory employees, Tina Merkerison, Amber Townsend, and Patricia Thayer, who all worked in the billing and audit department, and Melanie O'Connor, a respiratory therapist.

The three billing employees, all unindicted co-conspirators who cooperated pursuant to proffer agreements,[2] provided testimony that detailed the billing practices at Southern Respiratory. (Tr. Exs. D-89, D-92.) Those three former employees, Tina Merkerison in particular, testified that Defendant instructed them to forge doctor and patient signatures in response to Medicare audits requested by the Center for Medicare and Medicaid Services ("CMS") and its contractor AdvanceMed. Next, four physicians, Dr. Pamela Salazar, Dr. James Polhill, Dr. Susan Land, and Dr. Chris Shepard,

---

[2] Patricia Thayer admitted to engaging in the conspiracy at the direction of Defendant, but no proffer agreement was introduced at trial for her.

testified that their names were forged on patient files without authorization. The identity theft charges were further supported by physical evidence seized from Southern Respiratory that included carbon paper with traced signatures, cut out signature lines, pre-signed forms, and forged documents all found in what Defendant referred to as the "arts and crafts box." (See Tr. Exs. 1B, 1C, 1C-1, 1C-2, 1D.)

After the close of the Government's case, Defendant invoked her constitutional right to not testify and did not present any evidence. Her main defense was not that the fraud did not occur, but rather it was the unindicted co-conspirators, especially delivery technician Steve McMillan, who committed the crimes. In support, defense counsel repeatedly questioned the credibility of the unindicted co-conspirators on cross-examination and laid much of the blame at the feet of McMillan, who did not testify. Now, Defendant makes two post-trial motions to challenge her conviction. (Docs. 108, 109.)

## II. DISCUSSION

### A. Motion for Judgment of Acquittal

#### 1. Legal Standard

A motion for acquittal should be granted only if "the evidence is insufficient to sustain a conviction" on the offense charged.

FED. R. CRIM. P. 29(a). In considering a Rule 29 motion for judgment of acquittal, the trial court is required to determine whether, viewing all the evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. United States v. O'Keefe, 825 F.2d 314, 319 (11th Cir. 1987). The verdict must stand if there is substantial evidence to support it, that is, "unless no trier of fact could have found guilt beyond a reasonable doubt." United States v. Pineiro, 389 F.3d 1359, 1367 (11th Cir. 2004) (citation omitted).

2. Counts 1-22

Defendant argues that the evidence at trial was insufficient to prove beyond a reasonable doubt that she acted with the requisite intent to commit health care fraud as alleged in Counts 2 through 22 and conspiracy to commit health care fraud as alleged in Count 1. In support, Defendant contends the evidence at trial showed she relied on Steve McMillan's expert advice on billing and she was otherwise unaware of any issues with Medicare billing. Further, McMillan's commission reports purportedly prove seat cushions were delivered to patients for Counts 3, 4, 7-9, and 12-16. Finally, unindicted co-conspirators Tina Merkerison, Amber Townsend, and Patricia Thayer — all Southern Respiratory employees

5

— testified that McMillan instructed them on billing, including billing for DME not provided to patients. This contradicted both the earlier testimony that Defendant directed the employees on Medicare billing and the employees' initial statements to investigators denying any wrongdoing. Thus, according to Defendant, the discrepancies in Southern Respiratory employees' testimony and the evidence of McMillan's involvement both show the Government's evidence of intent is insufficient to sustain the jury's verdict. (See Def.'s Mot. for J. of Acquittal, Doc. 108, at 3-6.)

Viewing the evidence in the light most favorable to the Government, the Court finds there was ample evidence of Defendant's intent to support the jury's verdict. The Government needed to prove a knowing and willful execution of a scheme to defraud Medicare in connection with delivery of or payment for health care. See 18 U.S.C. § 1347; United States v. Marti, 294 F. App'x 439, 444 (11th Cir. 2008). The Government was also required to prove that a conspiracy existed, that Defendant knew of it, and, with knowledge, voluntarily joined it. United States v. Crabtree, 878 F.3d 1274, 1285 (11th Cir. 2018).

Defendant's focus on discrepancies in Southern Respiratory employees' trial testimony disregards the medical records introduced into evidence. A comparison of Southern Respiratory's patient records and the billing records from Brightree shows

Defendant changed billing entries from K4 Wheelchairs to the more expensive K7 Wheelchairs and, in many instances, added wheelchair accessories that were not included in prescriptions or delivery tickets. The Brightree records show Defendant's login was used to makes these changes. (See, e.g., Tr. Ex. 3B, at 15-16; Tr. Ex. 4B, at 9; Tr. Ex. 12B, at 10-11.) This was supplemented with the testimony of Kathy Quehl, a Brightree representative, who explained that the software assigned unique login information to individual users and tracked the billing activity performed under that login. This evidence is sufficient to show Defendant knowingly and willfully executed the alleged scheme and that she, with knowledge, joined the conspiracy to execute said scheme.

Moreover, on a Rule 29 motion, the Court must draw all reasonable inferences and credibility determinations in favor of the Government. Stated another way, the Court must assume the truth of the Government's evidence. United States v. Martinez, 763 F.2d 1297, 1312 (11th Cir. 1985). Accordingly, Defendant's arguments about the inconsistencies between Southern Respiratory employees' testimony and their initial statements to investigators are unavailing. The jury considered those differences and determined the witnesses were still credible; the Court must respect that determination.

Defendant's argument regarding McMillan's commission reports showing delivery of seat cushions for Counts 3, 4, 7-9, and 12-16

fails for two reasons. First, while the commission reports show McMillan provided the seat cushions, his signed delivery tickets show that seat cushions were never provided. (Compare Tr. Ex. D-33A, at 3, with Tr. Ex. 3A, at 20; compare Tr. Ex. D-33A, at 28, with Tr. Ex. 12A, at 4.)[3] Further, Southern Respiratory employees testified that delivery tickets were placed on Defendant's desk for her to use when completing the billing. Commission reports were not submitted until the end of the month, many times weeks after Defendant billed the DME on the Brightree system. Thus, the commission reports were not the documents Defendant relied on to bill Medicare and do not require a judgment of acquittal on the above listed counts.

Second, even if the seat cushions were on each patient's delivery ticket, Defendant's argument does not address the other improperly billed items in each of the above-listed counts. Put differently, the Brightree billing records still show Defendant changed the billing entries from K4 Wheelchairs to the more expensive K7 Wheelchairs and added the anti-tipping devices, loop heel holders, adjustable height armrests, and back cushions[4] when none of those accessories were delivered. (Compare Tr. Ex. 3A, at

---

[3] These citations are used as two examples of the discrepancy between McMillan's commission reports and the corresponding delivery ticket in the patient files. The evidence shows the same discrepancy for each count challenged, but the Court, for the sake of brevity, will not cite every relevant trial exhibit.
[4] The cushions at issue are seat cushions, billing code E2601, which are different from back cushions, billing code E2611.

8

20, <u>with</u> Tr. Ex. 3B, at 15-16; <u>compare</u> Tr. Ex. 12A, at 4, 14, <u>with</u> Tr. Ex. 12B, at 8-11.)   As such, Defendant is not entitled to a judgment of acquittal on Counts 1-22.

### 3. Counts 26-28

Defendant was charged and found guilty of healthcare fraud in Counts 26-28 for billing Medicare for CPAP supplies not ordered by a physician, not medically necessary, or not provided as billed. Defendant attacks the evidence on these counts by arguing all the items billed were prescribed by the patient's physician, as shown in Trial Exhibits D-222, D-225, and D-228.   While Defendant concedes that Melanie O'Connor's testimony and related documents showed she did not deliver all the items billed, Defendant maintains that it is the prescription that matters because only physicians — not respiratory therapists like O'Connor — have the authority to determine what DME a patient needs. (<u>See</u> Def.'s Mot. for J. of Acquittal, at 6-7.)

Defendant's position is unsupported by the law and the evidence produced at trial.   First, healthcare fraud includes billing for DME that was not prescribed by a physician, not medically necessary, <u>or</u> not provided as billed.   (<u>See</u>, <u>e.g.</u>, Indictment, ¶¶ 19, 22, 25, 28.)   Any one of the three options can support a conviction for healthcare fraud.   Further, Stephen Quindoza, the Government's Medicare expert, testified that

9

Medicare requires equipment to be prescribed and delivered to the patient for Medicare to pay the claim. So, while the CPAP supplies billed in Counts 26-28 were prescribed, they were not provided as billed. (See Tr. Ex. 26A, at 2-5; Tr. Ex. 27A, at 2-8; Tr. Ex. 28A, at 2-4.) Therefore, the evidence was sufficient to support the jury's verdict on those counts.

### 4. Counts 29-36

The jury found Defendant guilty of aggravated identity theft in Counts 29-36 for forging or aiding and abetting others forging the signatures of four doctors and three patients in an effort to comply with CMS audits. Aggravated identity theft requires the Government to prove the defendant knowingly transferred, possessed, or used a means of identification of another without lawful authority. 18 U.S.C. § 1028A(a). The identity theft must be committed during and in relation to an underlying felony listed in the statute, which includes health care fraud and conspiracy to commit health care fraud. See id. § 1028A(c)(5).

Defendant makes two arguments regarding the identity theft counts. First, she contends that because there is insufficient evidence to support the underlying felonies of health care fraud and conspiracy, Defendant cannot be convicted of identity theft relating to those crimes. Second, Defendant argues there is no physical evidence connecting her to the forgeries, only the

unreliable testimony of Southern Respiratory employees who continuously changed their story and contradicted one another. (See Def.'s Mot. for J. of Acquittal, at 8-9.)

Neither of Defendant's arguments provide a basis for judgment of acquittal on the identity theft counts. As shown above, there is ample evidence to sustain a conviction for the underlying felonies. Of note, although Count 30 lists Count 23 as the corresponding underlying felony and the jury found Defendant not guilty on Count 23, conspiracy to commit healthcare fraud is also a qualifying underlying felony under 18 U.S.C. § 1028A(c)(5). Because Defendant was found guilty of conspiracy to commit healthcare fraud, there is an underlying felony to support the conviction of aggravated identity theft in Count 30.

Moreover, the evidence at trial showed that Defendant instructed Tina Merkerison, Patricia Thayer, and Amber Townsend to forge doctors' and patients' signatures after the fact to comply with CMS audits. Merkerison testified extensively that Defendant tasked her with handling the audits and doing whatever was necessary to create the requested paperwork. Thayer also testified that Defendant instructed her to forge signatures and that she saw Defendant forge a physician's signature. Further, there was a significant amount of physical evidence to prove forgery occurred, including altered patient files, carbon paper with traced signatures, signature lines cut out from paperwork, and other

evidence found in the so called "arts and crafts box." While the box was found at Merkerison's desk and she admitted to committing forgeries, it was done at the direction of Defendant.

Finally, as previously stated, in a Rule 29 motion the Court must resolve credibility determinations in favor of the Government. Thus, Defendant's position that inconsistencies in the testimony of Southern Respiratory employees requires acquittal is unavailing. Overall, viewing the evidence in the light most favorable to the Government commands the conclusion that there was sufficient evidence to support the verdict on Counts 29-36.

## B. Motion for New Trial

A motion for a new trial must be granted "if the interest of justice so requires." FED. R. CRIM. P. 33(a). A court can set aside a verdict and grant a new trial if it concludes that the evidence "preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." Martinez, 763 F.2d at 1313 (citation omitted). Motions for new trial based on the weight of the evidence are not favored; the Eleventh Circuit directs that courts cautiously and sparingly grant them only in "really exceptional cases." Id. Unlike a motion for judgment of acquittal, "the court need not view the evidence in the light most favorable to the verdict," it may weigh the evidence and consider witnesses' credibility. Id. at 1312.

While the district court enjoys broad discretion, what the court may not do is "reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." Id. at 1312-13.

Defendant sets out nine grounds for granting a new trial:

1.  Because of the likely miscarriage of justice that occurred as a result of the admission of numerous exhibits of financial records that bore no relationship at all to any elements of the crime with which she was charged and in particular, evidence of purchases of jewelry and an all-terrain vehicle that were purportedly admitted to show her motive, but that were extremely prejudicial and of little probative value.

2.  Because of the likely miscarriage of justice that occurred as a result of the Court's refusal to allow Ms. Pate to elicit any evidence regarding Medicare audits of Southern, and in particular Medicare's suspension of payments to Southern and correspondence between Special Agent David Graupner and the Medicare contractor regarding administrative actions during the government's investigation of Southern and Ms. Pate.

3.  Because of the likely miscarriage of justice that occurred as a result of the Court's refusal to allow Ms. Pate to elicit testimony at trial that the physicians identified as victims of aggravated identity theft continued to use Southern after learning about the forgeries at issue, up to the time of trial.

4.  Because of the likely miscarriage of justice that occurred as a result of the Court's refusal to allow Ms. Pate to admit evidence of a letter from Delta Medical Equipment, a competing DME company started by Tina Merkerison, who was one of the government's main witnesses against Ms. Pate.

5.  Because of the likely miscarriage of justice that occurred as a result of the Court's denial of Ms. Pate's Motion in Limine to Exclude Evidence of

Other Crimes, Wrongs, of Other Acts at Trial (Doc. No. 85), which prevented Ms. Pate from presenting any character evidence in her defense.

6. Because of the likely miscarriage of justice that occurred as a result of the Court's admission of evidence of a text message between Ms. Pate and Ms. Merkerison that contained profanity, was extremely prejudicial, and had no probative value.

7. Because of the likely miscarriage of justice that occurred as a result of the Court's amendment to the standard jury instruction for Health Care Fraud, O53, which was confusing and misleading as to what the government was and was not required to prove.

8. Because of the likely miscarriage of justice that occurred as a result of the Court's refusal to excuse Juror Number 21 for cause, who admitted to learning about the case in the press and discussing the case with her co-workers.

9. Because of the likely miscarriage of justice based on the paucity of evidence that Ms. Pate engaged in any fraudulent conduct or conspired to do so.

(Def.'s Mot. for New Trial, Doc. 109, at 2-3.)  The Court will address each of these arguments in turn.

1. Financial Records

At trial, the Government presented the testimony of two retailers, from whom Defendant purchased jewelry and an ATV.  The Government also introduced Karen Hartley, an investigative financial analyst and certified fraud examiner, who reviewed Southern Respiratory's First Citizens Bank account and prepared a summary chart of all debits over $10,000.00 during the period of the conspiracy.  (See Tr. Exs. 72A, 72B.)  The chart included debits for the jewelry purchase, the ATV purchase, checks issued

to Defendant and to cash, and multiple other business expenses.[5] (Id.)

Defendant contends this evidence was irrelevant and unduly prejudicial such that the Court erred in allowing its admission. First, Defendant claims Hartley's testimony and the summary chart were unduly prejudicial because the $10,000.00 threshold was an attempt to backdoor previously dismissed money laundering counts and because the chart did not provide the reason for the debits listed. Second, Defendant argues the jewelry and ATV purchases were not relevant to the crimes charged, allowed the Government to unfairly paint Defendant as "greedy," and only served to bias the jury against Defendant by stoking class prejudices.

As to Defendant's first argument, the Court finds the probative value of the financial records and summary chart were not substantially outweighed by the danger of unfair prejudice. Defendant's primary defense was that other Southern Respiratory employees were responsible for the fraud. The financial records refuted this position by showing Defendant reaped much of the financial rewards of the scheme. To that end, the chart showed $565,000.00 in debits to Detra Pate, $100,000.00 in debits to "Cash," $26,960.00 in debits for jewelry purchases, and a

---

[5] The chart was admitted as evidence but not allowed to go to the jury during deliberations. The jury was also instructed on the use of summary charts. (Jury Charges, Doc. 101, at 11.) Finally, the Government introduced all the checks issued from Southern Respiratory's bank account that provided the underlying support for the information in the chart. (See Tr. Ex. 72B.)

$23,672.94 debit for the ATV purchase. (Tr. Ex. 72A.) Evidence showing Defendant was the beneficiary of the fraud was also directly relevant to the conspiracy charge.[6] Accordingly, the financial records evidence was probative and relevant to the issues of the case. See United States v. Bradley, 644 F.3d 1213, 1271-72 (11th Cir. 2011); United States v. White, 589 F.2d 1283, 1286 n.7 (5th Cir. 1979) ("Where there is other evidence of the guilt of the accused and the crime is of such a nature that the acquisition of money may be regarded as a natural or ordinary result of its perpetration, evidence is admissible of the sudden acquisition of money by the defendant . . . at or subsequent to the time the offense was committed." (quoting United States v. Manning, 440 F.2d 1105, 1110 (5th Cir. 1971)).

Defendant's contention that the chart lacked a description of the debits holds little weight. Most of the debits were self-explanatory in nature. For example, "American Express," "Wells Fargo Mortgage Payment," "United States Treasury (IRS)," and "Guardian Life Insurance Company," allowed the jury to easily understand the purpose of those debits. Also, the jury had already heard from multiple witnesses about "Drive Medical" and "Pinnacle

---

[6] As the Government points out, the Indictment stated, "It was further part of the conspiracy and among its manner and means that the Defendant DETRA WILEY PATE would transfer and disburse, and would cause the transfer and disbursement, of hundreds of thousands dollars in proceeds of her fraudulent billing scheme, for her own use and enjoyment and the use and enjoyment of others." (Indictment, ¶ 16.)

Medsource," both DME supply companies. Thus, those debits needed little description. For the transactions that did not have an obvious purpose, namely "IGD" and "Tomberlin," the Government used the testimony of the two retailers to explain those debits. Further, on cross-examination defense counsel elicited from Hartley the purpose of multiple transactions, showing how most debits listed were legitimate business expenses.

The Court is also unconvinced that any prejudice existed from using a threshold of $10,000.00. At no point during Hartley's testimony was money laundering mentioned, nor any other witness for that matter. Some threshold was necessary for the summary chart to have any value and to limit the scope of Hartley's testimony because she reviewed over 12,000 transactions from Southern Respiratory's bank account.

At bottom, the probative value of the financial records was not substantially outweighed by the prejudicial effect. "Motive is always relevant in a criminal case, even if it is not an element of the crime," United States v. Hill, 643 F.3d 807, 843 (11th Cir. 2011), particularly here where Defendant essentially claimed she did not have a motive.

### 2. CMS Audits

The Court precluded Defendant from introducing evidence of communications between Special Agent Graupner and CMS and its

contractor AdvanceMed regarding audits and administrative actions taken against Southern Respiratory. Although the audits were generally referenced at trial, predominantly during Special Agent Graupner's description of his investigation, the Court ruled the door was not opened for Defendant to introduce the communications.[7]

Defendant maintains that the Government opened the door twice to this evidence. First, during Special Agent Graupner's testimony, the Government elicited testimony regarding CMS's audit process for K7 Wheelchairs billed by Southern Respiratory. Second, Stephen Quindoza, the Government's Medicare expert, described the audit process and presented evidence of Southern Respiratory's response to audit letters. Defendant contends she should have been allowed to introduce communications in which Special Agent Graupner instructed AdvanceMed to coordinate all administrative actions with his investigation and evidence showing the Government could have prevented additional fraud if it had not prevented CMS from taking administrative action. In Defendant's view, this prevented the jury from fully assessing the Government's conduct and was misleading as to CMS's power to police Medicare providers.

The Court maintains the Government never opened the door to the evidence Defendant sought to admit. At the pre-trial conference, defense counsel stressed that the communications would

---

[7] Defendant attached the communications at issue as Exhibits A, B, and C to her motion for new trial. (Docs. 109-1, 109-2, 109-3.)

become relevant if the Government made arguments that Defendant wasted taxpayer money.[8] The Government never made this argument at trial. While both Special Agent Graupner and Quindoza discussed audits, neither they nor any other witness intimated that Defendant's actions wasted Medicare's funds. Further, the availability of administrative actions to CMS is largely irrelevant to the crimes at issue. See United States v. Akhigbe, 2009 WL 8633203, at *2 (D.D.C. Dec. 3, 2009) (granting the Government's motion in limine to exclude evidence of alternative remedies in a health care fraud case because "the availability of civil or administrative remedies against the defendant is irrelevant"), aff'd, 643 F.3d 1078 (D.C. Cir. 2011). The Court properly kept the irrelevant communications between Special Agent Graupner and CMS out of evidence because the Government never opened the door.

### 3. Physicians' Continued Use of Southern Respiratory

The Government presented the testimony of four doctors whose identities and Medicare National Provider Identifier numbers were used by Defendant without authorization. Their testimony related to the aggravated identity theft in Counts 29-33. Defendant argues the Court erred by preventing her from cross-examining the

---

[8] During the pre-trial conference, the Court reserved ruling on the Government's motion in limine to exclude evidence of CMS audits. The Court determined it would be more appropriate to rule on the communications' admissibility in the context of trial.

physicians as to why they continued to refer patients to Southern Respiratory after being made aware of the identity theft by investigators. This evidence, Defendant contends, was relevant to her intent.

The doctors' subsequent actions after learning about the identity theft were appropriately excluded as irrelevant. See FED. R. EVID. 401. In fact, any knowledge or actions of a victim after the crime is complete is generally not relevant to a defendant's intent at the time the crime is committed. Moreover, there was some suggestion at trial that Southern Respiratory was the only Medicare wheelchair supplier in the area, which shows the physicians did not have a choice when referring patients in need of DME. At any rate, the evidence was correctly excluded as irrelevant under Rule 401.

### 4. Delta Medical Equipment Letter

During the cross-examination of Tina Merkerison, Defendant sought to introduce a letter authored by former Southern Respiratory employee Kimberly Grotz, who Merkerison partnered with in 2017 to start a competing DME supply company, Delta Medical Equipment. The letter was sent to doctors at Augusta Lung Associates, a referral source for Southern Respiratory, and attempted to solicit their business. (See Ex. D to Def.'s Mot. for New Trial, Doc. 109-4.) Merkerison previously admitted on

cross-examination that she and Grotz registered Delta Medical with the Secretary of State and obtained a Medicare National Provider Identifier, but the company was only a "dream" and it never did any business. Defendant attempted to introduce the letter to impeach that testimony by showing Delta Medical did solicit business. The Government objected on hearsay grounds and argued the letter was written and sent by Grotz, not Merkerison. Defendant countered by offering the evidence solely for impeachment purposes, not to prove the truth of the matter asserted.[9] The Court allowed defense counsel to cross-examine Merkerison using the letter but did not admit the letter into evidence or allow it to be published to the jury.

Defendant argues the Court's failure to admit the letter unfairly prejudiced her. In support, she contends Merkerison adopted the letter as her own statement by virtue of her business relationship with Grotz and ownership interest in Delta Medical. Alternatively, Defendant argues that the letter was impeachment evidence and should have been admitted to contradict Merkerison's earlier testimony.

The Court first notes that Merkerison did not adopt the letter as her own statement. The letter was written by another person,

---

[9] Defendant had little motivation to prove the contents of the letter considering it accused Southern Respiratory — and by extension Defendant herself — of unethical business practices.

was not printed on official Delta Medical letterhead, and repeatedly references Grotz's actions, Grotz's patient care experience at Southern Respiratory, and Grotz's desire to work with Augusta Lung Associates in the future. (See, e.g., id. ("I have worked for Southern Respiratory . . . I look forward to working with you.").) Further, Merkerison testified that she had no knowledge of the letter at the time it was sent and was first informed of its existence when Defendant fired her via text message. Moreover, Defendant cites no case or rule of evidence to support her argument. Simply put, familiarity with its contents and an ownership interest in Delta Medical does not provide the basis to conclude that Merkerison adopted the letter as her own statement.[10]

As to Defendant's impeachment argument, it is well established that a party may not present extrinsic evidence on a collateral matter. FED. R. EVID. 608(b); FED. R. EVID. 403; United States v. Russell, 717 F.2d 518, 520 (11th Cir. 1983) ("The Federal Rules of Evidence discourage the admission of extrinsic evidence to prove or disprove issues which are collateral to the subject matter of the case."); United States v. Taylor, 426 F. App'x 702, 705 (11th Cir. 2011) ("Rule 608(b) provides that a party may not

---

[10] For this reason, Federal Rule of Evidence 613 is inapplicable. A party may not use the prior inconsistent statement of another person who does not testify at trial to impeach a witness.

introduce extrinsic evidence to attack a witness's character for truthfulness."). It is equally well established that "extrinsic evidence under Rule 608(b) can include documents." 28 Charles Alan Wright and Victor J. Gold, Federal Practice and Procedure § 6117, at 95 (2d ed. 2012). Although extrinsic evidence in the form of documents may not be admitted under Rule 608(b) to impeach by contradiction, "the rule does not preclude cross-examination based on extrinsic evidence that would otherwise be inadmissible." Id. at 97.

Here, the Delta Medical letter was extrinsic evidence offered to impeach Merkerison by contradicting earlier statements that Delta never did any business and was just an unrealized "dream." Because Defendant argues it was offered solely to impeach Merkerison's prior testimony by contradiction, the letter relates to a collateral matter. See McCormick on Evidence, § 45 (7th ed. 2016) ("A matter is deemed 'collateral' if the matter itself is irrelevant to establish any fact of consequence in the litigation.") Said another way, Delta Medical's attempts to solicit business from local doctors and Merkerison's testimony regarding that business was not relevant or material to the allegations against Defendant. As such, the Court acted within its discretion by not admitting the letter but still allowing defense counsel to cross-examine Merkerison on the topic.

The Eleventh Circuit previously upheld a similar evidentiary ruling in United States v. Adams, 799 F.2d 665, 671 (11th Cir. 1986). There, the district court did not err in refusing to admit a medical record offered to contradict the witness's testimony regarding whether his child was born before or after he was released from prison. The Eleventh Circuit found the birth date of the witness's child was "clearly a collateral matter on which [the witness] cannot be impeached with extrinsic evidence" because the case concerned drug trafficking. Id. A similar factual situation exists here where a document not authored by Merkerison was offered to prove a contradiction on a matter irrelevant to Defendant's guilt or innocence on the crimes charges. Overall, the letter was properly kept out of evidence.

### 5. Defendant's Prior Shoplifting Arrest

In a motion in limine, Defendant attempted to exclude the introduction of any evidence of her 2009 arrest for shoplifting. (Doc. 85.) The Court denied the motion and stated it would allow the Government to use the evidence to cross-examine any character witnesses Defendant called to testify. Ultimately, Defendant chose not to present any character witnesses and the shoplifting arrest was not brought up during trial. Defendant contends the Court erred by not allowing her to put up character witnesses

without the risk the Government would cross-examine them on the shoplifting arrest.

Defendant primarily contends the Government lacked a good faith basis to cross-examine any character witnesses on the shoplifting arrest because there was no witness to verify the incident occurred and the prosecutor dismissed the shoplifting case for insufficient evidence. A conviction, however, is not necessary for the evidence to be admissible. As the Supreme Court noted, "[a] character witness may be cross-examined as to an arrest whether or not it culminated in a conviction, according to the overwhelming weight of authority." Michelson v. United States, 335 U.S. 469, 482 (1948). This rule is not intended to create prejudicial propensity inferences about the defendant, rather the rule is necessary to test the knowledge of the defendant's character witness. If the witness does not know about the arrest, the jury may consider that fact in assessing the credibility of the witness's opinion on character. See id. at 483. Cross-examining potential character witnesses' knowledge was precisely the justification the Government gave for using the shoplifting arrest.

Further, there was ample evidence to provide a good faith basis to cross-examine potential character witnesses on the arrest. Defendant herself submitted the Recommendation of Nolle Prosequi signed by the state prosecutor, which states, "[a]fter

25

*initial arrest*, it has been determined that there is insufficient evidence to continue prosecution." (Doc. 85-1 (emphasis added).) The fact that Defendant was not prosecuted does not negate that an arrest still occurred. Moreover, Defendant made the motion to exclude despite the Government never disclosing their intent to use the arrest at trial.

Defendant further argues that using the arrest to cross-examine character witnesses was a thinly veiled attempt to introduce inadmissible propensity evidence barred by Rule 404(b)(1). The Government, however, never indicated an intention to use the arrest as evidence in its case-in-chief or to raise a propensity inference. Rather, it only intended to use the arrest to test the knowledge of character witnesses on cross-examination. While Defendant correctly states that Rule 404(b)(1) prohibits the use of a crime to prove a person's character and propensity to commit other crimes, that provision is subject to Rule 404(a)(2). That subsection provides that a criminal defendant "may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it." FED. R. EVID. 404(a)(2)(A). Simply put, Defendant cannot offer character witnesses then object when the Government attempts to impeach those witnesses by testing their knowledge of Defendant's character. In sum, the Court's decision to deny Defendant's motion in limine regarding her shoplifting arrest does not necessitate a new trial.

6. Text Message

Defendant next contends the Court erred in admitting a text message in which Defendant described Tina Merkerison's job title as "Audit Bitch." (Tr. Ex. 58.) In Defendant's view, the text message was unduly prejudicial and had no probative value.

The probative value of the text message lies in its illustration of the relationship between Defendant and Merkerison. The defense's primary theory at trial was that Southern Respiratory employees engaged in the fraud and cover up during the CMS audits and that Defendant was either unaware or relied on other employees in good faith. The text message refutes this theory by showing Defendant's management style, involvement in the audit process, and direction to employees to follow her instructions regarding billing and audits. From that text message the jury could reasonably conclude Defendant directed Merkerison to handle the audit requirements and managed her employees using aggressive or demanding methods, as previously revealed by Merkerison's description of Defendant as a "bully." While there is little doubt as to the prejudicial effect of the text message, it did not *substantially outweigh* the probative value. See Fed. R. Evid. 403. As such, the admission of the text message into evidence does not require a new trial.

### 7. Health Care Fraud Jury Instruction

Defendant challenges the Court's jury instruction on health care fraud under 18 U.S.C. § 1347. The Court, at the Government's request, modified the pattern jury instruction to make clear that proof of each of the five health care fraud elements for one item of DME listed in each count was sufficient to find the Defendant guilty on that count.[11]

Defendant repeats her argument concerning Steve McMillan's commission reports showing delivery of seat cushions in Counts 3, 4, 7-9, and 12-16 (see Section II.A.2, *supra*) and contends it was improper to modify the health care fraud pattern instruction to read: "It is sufficient, if you unanimously agree that the Government proved each of the five elements, beyond a reasonable doubt, for at least one item listed in each count." (Jury Charges, at 18.) In Defendant's view, proof that one item listed in a count was not fraudulently billed required the jury to find Defendant not guilty on that count, regardless of proof that other items were fraudulently billed. She argues the "issue in this case did not relate to the *means* of violating the statutes alleged in the indictment, but the actual *evidence* that the indictment alleged

---

[11] Defendant objected to the charge (see Doc. 88), and thus the Court rejects the Government's argument that Defendant waived her ability to challenge the instruction in this motion.

would prove the statutory violation." (Def.'s Mot. for New Trial, at 16 (emphasis in original).)

It is the common practice of federal prosecutors to charge a defendant in the conjunctive with several alternative theories, even where the statute is framed in the disjunctive. See United States v. Howard, 742 F.3d 1334, 1344 n.3 (11th Cir. 2014) (collecting cases from each federal circuit court). This approach is necessary to show "the grand jury has found probable cause for all of the alternative theories that go forward." United States v. LaPointe, 690 F.3d 434, 440 (6th Cir. 2012). However, at trial the Government need only prove one of the methods to sustain a conviction. United States v. Pacchioli, 718 F.3d 1294, 1300-01 (11th Cir. 2013); United States v. McAuliffe, 490 F.3d 526, 534 (6th Cir. 2007) (an indictment may charge conjunctively and at trial "the government may prove and the trial judge may instruct in the disjunctive form"); United States v. Booth, 309 F.3d 566, 572 (9th Cir. 2002) ("When a statute specifies two or more ways in which an offense may be committed, *all may be alleged in the conjunctive in one count and proof of any one of those conjunctively charged acts may establish guilt.*" (emphasis added)).

Defendant's attempt to separate the means of violating the statute from the evidence alleged to prove the violation is largely a distinction without a difference. Regardless, the hornbook law

cited above still applies and refutes Defendant's argument. In this case, the indictment alleged multiple methods of violating the statute in a single count — for example, billing for K7 Wheelchairs, billing for loop heel holders, billing for adjustable height armrests that were "not ordered by a physician; not medically necessary; not provided as billed; and, therefore, not entitled to reimbursement by Medicare." (Indictment, ¶ 19.) Proof of just one of those methods is sufficient to sustain a conviction on that count. See Richardson v. United States, 526 U.S. 813, 817 (1999) ("[A] federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime.").[12]

Moreover, basic logic dictates that evidence showing Defendant fraudulently billed at least one item listed in a count is adequate to sustain a conviction on that count. Simply because some evidence showed that one item may have not been fraudulently billed[13] does not negate the fact that other items were fraudulently

---

[12] The Supreme Court went on to say: "Where, for example, an element of robbery is force or the threat of force, some jurors might conclude that the defendant used a knife to create the threat; others might conclude he used a gun. But that disagreement — *a disagreement about means* — would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely, that the defendant had threatened force." Id. (emphasis added).

[13] The Court does not agree that McMillan's commission reports prove that seat cushions were not fraudulently billed. As stated previously, Defendant did not rely on commission reports to bill Medicare; she used delivery tickets, none of which show seat cushions were provided to the patient. (See Section II.A.2, *supra*.)

30

billed.  At any rate, the health care fraud jury instruction was proper.

8. <u>Juror Number 21</u>

During voir dire, Juror 21 indicated she knew about the case from reading news stories and discussing it with her co-workers. When further questioned at sidebar, Juror 21 did not provide specific details of those conversations but stated she did not have an opinion as to what Defendant "should get."  Defendant argues this statement shows Juror 21 had already assumed Defendant's guilt and it was error for the Court to not strike her for cause, thereby forcing Defendant to use a peremptory challenge.

To evaluate the fitness of prospective jurors, courts consider whether the jurors "had such fixed opinions that they could not judge impartially the guilt of the defendant." <u>Patton v. Yount</u>, 467 U.S. 1025, 1035 (1984) (acknowledging publicity of the case and prior knowledge of jurors is not disqualifying) (citing <u>Irvin v. Dowd</u>, 366 U.S. 717, 723 (1961)).  When reviewing juror impartiality, the Eleventh Circuit "has focused on whether (1) the juror may be affected by matters not in evidence, and (2) the juror may presume guilt rather than innocence." <u>United States v. Dickerson</u>, 248 F.3d 1036, 1045 (11th Cir. 2001) (citation omitted).  Where a juror unequivocally states he or she can be impartial and will consider only the evidence presented, a court

may deny a party's request to strike for cause. See, e.g., id. at 1045; United States v. Spence, 499 F. App'x 869, 872 (11th Cir. 2012); see also United States v. Martin, 749 F.2d 1514, 1516-18 (11th Cir. 1985) (finding trial court erred by denying party's challenge for cause where juror was equivocal in her response to questions about her ability to be impartial); Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla., 956 F.2d 1112, 1128-29 (11th Cir. 1992) (same).

Here, the prosecution specifically asked Juror 21 if she would be able to put aside any opinions she heard or formed and listen to only the in-court evidence and the law instructed to render a verdict. Juror 21 responded unequivocally that she could do so and later reaffirmed at sidebar that she did not form an opinion about Defendant's guilt or innocence. Further, Defendant admits that Juror 21 stated her prior knowledge and discussions "would not influence her ability to serve as a juror." (Def.'s Mot. for New Trial, at 17.) Accordingly, the Court acted within its discretion by not striking Juror 21 for cause, and this objection does not warrant a new trial.

9. Weight of the Evidence

Defendant requests a new trial based on the weight of the evidence being against the verdict. In support, she contends that the proof of intent from the three former Southern Respiratory

witnesses was clouded by inconsistent statements and evidence of bias against Defendant. Defendant argues those witnesses' lack of credibility requires the verdict to be set aside.

The Court finds that the impeachment of the Southern Respiratory witnesses was not so significant to consider their testimony not credible. At trial, the primary method of impeachment employed by defense counsel was to point out contradictions between those employees' initial statements to investigators in which they denied any wrongdoing and later statements blaming Defendant for directing them to engage in the scheme to defraud Medicare and related identity theft. It is not unusual in criminal cases for co-conspirators to initially deny wrongdoing and later change their story when confronted with evidence. Nor is it out of the ordinary for the Government to offer immunity in exchange for testimony against the alleged leader of the conspiracy. This case is no exception.

Moreover, even assuming those witnesses lacked credibility, there is still the overwhelming evidence from patient medical records and the Brightree billing system that showed Defendant affirmatively changed billing entries to include items not prescribed or not delivered to patients. In most all these instances, Defendant removed items correctly billed by other Southern Respiratory employees — including the three who testified at trial — to add more expensive items or additional accessories.

Further, the summary chart introduced during the testimony of Kathy Quehl, a Brightree representative, showed Defendant "confirmed" the billing entry for 98 percent of K7 Wheelchairs billed in 2014, 97 percent in 2015, 94 percent in 2016, and 100 percent in 2017. (See Tr. Ex. 41A.) All told, the evidence of Defendant's intent to defraud Medicare does not preponderate heavily against the verdict, rather the evidence supports it. As such, the Court will not set aside the verdict.

### III. CONCLUSION

Defendant cannot show that the evidence at trial, viewed in the light most favorable to the Government, was insufficient to sustain a conviction. Accordingly, Defendant's motion for judgment of acquittal (Doc. 108) is **DENIED**. Similarly, none of the nine grounds set forth by Defendant require the Court to set aside the verdict and grant a new trial. Defendant's motion for new trial (Doc. 109) is therefore **DENIED**. Finally, having addressed both the Government's and Defendant's motions in limine at either the pre-trial conference or during trial, the Clerk is directed to **TERMINATE** those motions (Docs. 70, 75, 76, 85).

**ORDER ENTERED** at Augusta, Georgia, this _18th_ day of March, 2019.

_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA